1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM W. HAMILTON,

                    Plaintiff,

            v.

CITY OF OLYMPIA; RICH ALLEN and
JANE DOE ALLEN, and the marital
community thereof; PAUL BAKALA and
STACI  BAKALA, and the marital
community thereof; DON HEINZE and JANE
DOE HEINZE, and the marital community
thereof; BOB KRASNICAN and JANE DOE
KRASNICAN, and the marital community
thereof; CLIFF MAYNARD and JANE DOE
MAYNARD, and the marital community
thereof; and MICHAEL O'NEILL and
DIANE O'NEILL, and the marital community
thereof,

                    Defendants.

_____

LARRY MOSQUEDA,

                    Plaintiff,

            v.

CITY OF OLYMPIA; RICH ALLEN and
JANE DOE ALLEN, and the marital
community thereof; PAUL BAKALA and
STACI  BAKALA, and the marital
community thereof; DON HEINZE and JANE
DOE HEINZE, and the marital community
thereof; BOB KRASNICAN and JANE DOE
KRASNICAN, and the marital community
thereof; CLIFF MAYNARD and JANE DOE
MAYNARD, and the marital community
thereof; and MICHAEL O'NEILL and
DIANE O'NEILL, and the marital community
thereof,

                    Defendants.

Case No. C08-5315RJB

ORDER ON MOTION
FOR SUMMARY
JUDGMENT

ORDER
Page - 1

This matter comes before the Court on the Defendants' Motion for Summary Judgment. Dkts. 31 and 21. The Court has considered the pleadings filed in support of and in opposition to the motion, and the remainder of the file herein.

## I.  FACTS

These suits arise from anti-war demonstrations occurring in November of 2007. Dkt. 19, *Hamilton v. City of Olympia, et al.,* Western District of Washington cause number 08-5315RJB and Dkt. 1, *Mosqueda v. City of Olympia, et al.,* Western District of Washington cause number 08-5366RJB. On July 14, 2009, *Hamilton* and *Mosqueda* were consolidated under cause number 08-5315RJB. Unless otherwise indicated, citations to the record in this Order refer to the pleadings filed in *Hamilton v. City of Olympia*, Western District of Washington cause number 08-5315RJB.

### A.  BACKGROUND

In the fall of 2007, one of the U.S. Army's Stryker Brigades returned to Fort Lewis (located in Tacoma, Washington) from its deployment in Iraq. Dkt. 35, at 2. The Stryker Brigade's equipment, including several armored vehicles, were shipped from the Port of Kuwait to the Port of Olympia, in Olympia, Washington ("Port"). *Id.* The Army returned the equipment and vehicles to Fort Lewis for maintenance to prepare for the next deployment. *Id.*

The Port sits on the northern portion of a peninsula which juts out from downtown Olympia into Budd Inlet. Dkt. 38, at 1. The Port has two points of entry/exit, the Main Gate, located on Franklin Street, and the North Gate, located on Marine Drive. Dkt. 38. The Army moved its equipment by tractor-trailer convoys either by exiting: 1) the Main Gate, driving southbound on Franklin Street, then to Market Street, onto Plum Street, and then out to Interstate 5 to Fort Lewis; or 2) the North Gate driving southbound on Marine Drive to Plum Street, and then to Interstate 5. *Id.* A map of the Port and above mentioned streets appears in the record at Dkt. 40, at 5.

The first convoys carrying military equipment out of the Port began around 9:00 p.m. on November 7, 2007 and continued until 3:30 a.m. on November 8, 2007. Dkt. 34. There were 150-200 people gathered at the Port's Main Gate expressing their opposition to the war. Dkt. 34, at 2. City of Olympia Police Officers were present, and although they originally were in their regular uniforms, the officers

switched to full riot gear because the asserted that protesters were "grabbing batons, spitting at the officers, blocking streets, jumping in front of moving convoy trucks and throwing chunks of concrete, garbage cans and other objects into the roadway." *Id.*

According to the officers, no convoys were scheduled for Friday, November 9, 2007. Dkt. 34. The officers state that the Army did try to move equipment without an escort and a group of protesters seated themselves in the middle of the streets, thereby blocking the trucks from leaving. *Id.* The Army abandoned its attempts to move equipment that day. *Id.*

Officer Ray Holmes testified at his deposition that during the night of November 9-10, 2007, a group of protesters constructed barricades across the two streets that allow access to the Port. Dkt. 38. The barricade on Franklin Street, which blocked access to the Main Gate, was constructed of "portable fencing and concrete barrier blocks." Dkt. 38, at 2. The barricade on Marine Drive, which blocked access to the North Gate, was constructed of "dumpsters, part of a semi-tractor trailer rig, large concrete blocks, wooden palletts [sic], and other loose debris." Dkt. 38, at 2.

Officer Holmes states that on the morning of November 10, 2007, he led a team of officers to clear the Marine Drive barricade, near the North Gate. Dkt. 38, at 2. He states that there was a group of protesters outside the barricade exhibiting a "strong intent to resist being removed." *Id.* He determined that due to "the protestors hostile and aggressive speech directed against the police and a complete unwillingness to obey [his] multiple direct orders to leave," the best way to avoid injuries was to make a "general application of pepper spray." Dkt. 38, at 2. Pepper spray is a generic term for a chemical which is dispersed with aerosol as a propellant. Dkt. 41, at 2. Pepper spray is an irritant to the eyes, skin, and lungs. *Id.* Officers Cliff Maynard, Bob Krasnican, and Michael O'Neill moved forward and deployed pepper spray about 6-7 feet from the protestors. Dkt. 38, at 2. According to Officer Holmes, most of the protestors immediately moved away from the barricade. *Id.* The barricade was removed and Marine Drive reopened. *Id.*

**B.     NOVEMBER 10, 2007, PEPPER SPRAY INCIDENT INVOLVING  PLAINTIFF HAMILTON NEAR THE PORT'S MAIN GATE**

Officer Holmes states that after clearing access to the North Gate, he led a group of officers through the Port to the Main Gate. Dkt. 38, at 2-3. He states that there were protestors standing against the Franklin Street barricade, heavily covered with clothing, some wearing goggles. *Id.* Some of these

protestors had interlocked arms. *Id.*, at 3. He observed additional people standing in Franklin Street, others on the sidewalk to the west, and still others in a gravel area to the east. *Id.* The officers first cleared the protestors standing in Franklin Street and on the sidewalk. *Id.* Most of these people moved to the gravel area with the other protesters. *Id.* The officers then turned to dealing with those protestors standing against the barricade. *Id.* According to Officer Holmes, the protestors at the barricade "exhibited a strident intent to resist being removed with the goal of blocking the departure of the convoy." *Id.* Officer Holmes witnessed other officers using pepper spray on these protestors, which was not effective on most of them. *Id.* As a result, the officers then began to physically remove the protestors on the barricade. *Id.* Officer Holmes states that "[w]hile this was going on, the crowd assembled in the gravel area became hostile and boisterous. *Id.* Several individuals charged into Franklin and were pepper sprayed." *Id.*

Plaintiff Hamilton alleges in his Amended Complaint that on November 10, 2007, he was in the gravel area which had been designated a "safe area." Dkt. 19, at 3. He alleges that while there, Officers Krasnican, Maynard, and O'Neill sprayed him with pepper spray at close range. Dkt. 19, at 3.

Plaintiff Hamilton testified in his deposition that he was sprayed twice by two different people while near the Main Gate barricade. Dkt. 48-5, at 3. He states that he went to assist some of the people that were being physically removed from the barricade. *Id.* He asserts that they "were being thrown bodily away from the fence line, and they were blinded." *Id.* Plaintiff Hamilton states as he was helping one of the protestors, and "to the left of [his] peripheral vision, [he] saw an officer and immediately felt the pepper spray hit [him] in [his] eyes." *Id.* He asserts that he was "quite a ways away from where the actual action was and was in the place where the police were directing people to go to." *Id.* He states that he could not identify the officer because they were all in riot gear, but believed that he was male based on his size and demeanor. *Id.*, at 3-4. Plaintiff Hamilton asserts that he believed that the officer deliberately pointed the pepper spray canister at him and sprayed him. *Id.*, at 4. Plaintiff treated himself with a water and Maalox solution he brought from home. *Id.* Thirty seconds later, when he was administering the water Maalox solution to another protester's eyes, another police officer sprayed him a second time with pepper spray. *Id.* Plaintiff Hamilton states that although he does not know the identity of the second officer, the officer had on riot gear and had facial hair. *Id.*

Officer Maynard testified that he was one of the officers who deployed pepper spray at the Main

Gate barricade in an attempt to get the protesters to disperse. Dkt. 48-7, at 5. He stated that he believed that the officers choose to use pepper spray first because it was effective at the Marine Drive barricade and they wanted to avoid a physical confrontation. Dkt. 48-7, at 6-7. Officer Maynard stated that he began at one end of the line and went to the other end of the line several times, deploying multiple canisters of pepper spray. Dkt. 48-7, at 8. Officer Maynard states that the pepper spray was not as effective on this group of protesters due to the excessive clothing and goggles that they wore. *Id.*

Officer Michael O'Neill states that he also used pepper spray in an attempt to disburse the protestors lined up against the barricade south of the Port's Main Gate. Dkt. 44, at 1. He states that the others using the pepper spray were Officers Maynard and Krasnican. Dkt. 44, at 1. He states that after the pepper spray was applied to the protesters at the barricade, other officers removed them "by physically pulling them apart and escorting, pulling, or even carrying them over to the gravel area east of Franklin." Dkt. 44, at 2. Officer O'Neill states that during this time "the crowd of protesters in the gravel, approximately 100, became very hostile, chanting, among other things, 'fuck the police' and 'shame on you.'" *Id.* Officer O'Neill acknowledges in his deposition that he deployed the pepper spray two or three more times on people who moved out of the crowd standing on the gravel. Dkt. 48-9, at 3.

A pleading which is purported to be a police report from Officer Krasnican appears in the record. Dkt. 48-8, at 6. In that report, Officer Krasnican relates that he "dispensed 2 large canisters of OC-10 [pepper spray] toward a large group refusing to leave the roadway, on Franklin, just south of the main Port entrance." *Id.* He states that "he was no closer than about 8' from any one protester as [he] dispensed the OC in their general direction, with no direct applications." Dkt. 48-8, at 6.

In any event, after the protestors at the barricade were removed, the barricade was torn down and access to the Main Gate was reopened. Dkt. 38, at 2-3.

### C. NOVEMBER 10, 2007, PEPPER SPRAY INCIDENT INVOLVING PLAINTIFF MOSQUEDA AT FOURTH AND PLUM STREETS

According to Officer Steve Oderman, soon after the barricade at the Main Gate had been cleared, he reported for duty. Dkt. 43, at 2. He states that convoys began moving military equipment off the Port, onto Plum Street, headed for Interstate 5. Dkt. 43, at 2. He states that he was sent to the corner of Fourth Avenue and Plum Street, and upon arrival, found several protestors blocking the roadway by "pushing concrete blocks, newspaper boxes, and large metal dumpsters into Plum Street." *Id.* Officer Oderman

relates that after they cleared the road, the officers learned that another military convoy would be moving through in a few moments. *Id.* He moved his team in a line along the west side of Plum Street between State Street and Fourth Avenue. *Id.* He felt at the time that there were not enough officers to deal with the number of protesters. *Id.* As the convoy was passing, three young men ran into Plum Street, just south of Fourth, stopping the convoy. *Id.* According to Officer Oderman, Plaintiff Mosqueda and a young woman also went out into Plum Street. Dkt. 43, at 3. After being told to move back, they complied. *Id.* Then, another woman ran out from the east side of the street and stopped the convoy. *Id.* The young woman next to Plaintiff Hamilton tried to run into Plum and join the first woman, but was stopped by Officer Paul Evers when he blocked her using his crossed baton. Dkt. 43, at 3. Officer Evers pushed her back, causing her to fall onto the western side of the roadway. *Id.* According to Officer Oderman, Plaintiff Mosqueda came to the woman who had fallen, bent down to help her, and then stood up. Dkt. 43, at 4. Officer Oderman states that the young woman refused to get up and Plaintiff Mosqueda "persisted on being right up against the edge of the roadway in a confrontational way even when [Officer Oderman] ordered him to back up several times and tried to push him back." Dkt. 43, at 4. Another woman joined them, also refusing to move. *Id.* Officer Oderman states that, at that point, another officer sprayed them with pepper spray from a distance of about eight feet. Dkt. 43, at 5.

Plaintiff Mosqueda states that he was attending a political demonstration near the intersection of Fourth and Plum protesting the war. Dkt. 48-6, at 4. He asserts that after the young woman he was near was knocked down into the road, he leaned forward to help her. Dkt. 48-6, at 4. He states that as he was leaning forward, he got pepper sprayed. *Id.* Plaintiff Mosqueda states that he was hit by pepper spray straight in the eyes from about a foot or 18 inches away. Dkt. 48-6, at 3. He alleges that he was on the sidewalk around eight feet from the convoy truck when he was sprayed. *Id.,* at 5.

Plaintiff Mosqueda does not name an individual officer, or group of officers who could potentially have sprayed him, in his Complaint. Dkt. 1, *Mosqueda v. City of Olympia, et al.,* Western District of Washington cause number 08-5366RJB.

### D. NOVEMBER 11, 2007, BATON & PEPPER BALL INCIDENT INVOLVING PLAINTIFF HAMILTON

According to Plaintiff Hamilton, on the afternoon of November 11, 2007, he was standing on the corner of Franklin and Market Streets. Dkt. 48-5, at 6. He states that the day before, the "police had

advised us that if we wanted to cross the street, we had to use the pedestrian crosswalks that were provided." Dkt. 48-5, at 6. Plaintiff Hamilton states that he approached the line of officers that had been deployed to create a blockade. Dkt. 48-5, at 6. Plaintiff Hamilton states that he then said, "I want to cross the street." Dkt. 48-5, at 6. He asserts that he was not being threatening or doing anything inappropriate. Dkt. 48-5, at 6. He states that when he began to move across the street, attempting to use the crosswalk, he was stopped by being hit with a baton. Dkt. 48-5, at 6-7. He states that he did not push in the direction of the street and was standing on the curb. Dkt. 48-5, at 7. He asserts that he was struck in the jaw with a baton by a male officer and then he received a baton push to his abdomen by a female officer. Dkt. 48-5, at 7-8. He states that within seconds, another officer shot him with pepper balls in the legs and stomach. Dkt. 48-5, at 7. Pepper balls are filed with the active ingredient in pepper spray, with much the same effect, but on a more compact scale. Dkt. 41, at 3. Plaintiff Hamilton estimated that the entire episode took three to four seconds. Dkt. 48-5, at 5. As a result of this incident, Plaintiff Hamilton had some bruising on his jaw, abdomen, and legs. Dkt. 48-5, at 8. He states that he was unaware whether there was a convoy going by at the time. Dkt. 48-5, at 6-7. Plaintiff Hamilton indicates that he was "shocked" at the officers' reaction and he was not told he could not cross the street. Dkt. 48-5, at 6. At the time of these events, Plaintiff Hamilton weighed over 300 pounds. Dkt. 48-5, at 7.

Officer Rich Allen stated that he was one of the officers assigned to the Main Gate at the Port on November 11, 2007. Dkt. 32. Officer Allen stated that convoys of tractor-trailers carrying military equipment were periodically coming out of the Port's Main Gate headed southbound on Franklin and turning left onto Market Street. *Id.* He states that "our function was to keep protesters from moving into the roadway and attempting to block the convoys." *Id.* He states that "when the convoys were not running, we stood in a line across the north side of Franklin/Market intersection." *Id.* Officer Allen relates that around 2 p.m., he was in a line of officers standing along the curb on the southeast corner of Franklin and Market Streets. *Id.* Officer Allen states that Officer Paul Bakala was on his right and City of Tumwater Officer Jennifer Kolb was on his left. *Id.* There were 20-30 protesters on the sidewalk. *Id.* According to Officer Allen, while a convoy was going by, Plaintiff Hamilton, "a very large man," approached him from the crowd. *Id.,* at 2. Officer Allen states that Plaintiff Hamilton said he "was going to cross Market Street." Dkt. 22, at 2. Officer Allen told Plaintiff Hamilton that he could not do so then.

*Id.* Officer Allen asserts that Plaintiff paused, and then moved forward toward the female officer, Officer Kolb. *Id.* Officer Allen states that he "pushed him in the stomach area with [his] riot baton cross-wise." Dkt. 22, at 2. Officer Allen felt "[t]hat had no effect" and so "pushed him up higher, in the area of the upper chest." Dkt. 22, at 2. About that time, Plaintiff was being hit by pepper balls and stopped. Dkt. 22, at 2.

From her perspective, Officer Kolb states that when Plaintiff Hamilton approached the line officers, he immediately got into an argument with Officer Allen. Dkt. 39, at 1-2. She states that Plaintiff Hamilton than moved in her direction, and Officer Allen pushed him back with his riot baton. Dkt. 39, at 2. Officer Kolb states that she was concerned that he "would overpower [her] because of [her] size disadvantage." *Id.*

Officer Bakala was standing on the other side of Officer Allen at the time of this incident. Dkt. 33. He states that Plaintiff Hamilton angrily approached them and was shouting. Dkt. 33-2, at 3. Officer Bakala indicated that "it was clear to me as he was moving towards me with that statement, that his plan was to cross the street, which would be in front of the group of vehicles that were leaving." Dkt. 33-2, at 3. Officer Bakala states that he gave Plaintiff Hamilton an order to stop and get back. Dkt. 33-2 at 3. Officer Bakala states that he placed his riot baton on Plaintiff's chest and pushed him back. Dkt. 33-2, at 3. Officer Bakala states that Plaintiff took a step back or leaned back and came at him again. Dkt. 33-2, at 4. Officer Bakala states that he again pushed Plaintiff Hamilton back and Plaintiff came at him again in a "very agitated, very angry, very vocal" manner and "raised his hands up in an aggressive manner." Dkt. 33-2, at 4. Officer Bakala states that it was then that Plaintiff was hit by the pepper balls. *Id.*

Officer Don Heinze states that he was an officer at the scene "serving as backup to protect a line of officers standing along the curb on the southeast corner of the intersection by the LOTT building." Dkt. 37, at 2. He states that "a very large male," Plaintiff Hamilton, "attempted to break through the police line after he had been warned several times to keep back." *Id.* Officer Heinze states that Plaintiff was "initially pushed back by one of the officers using his baton, then came forward again toward the female officer in the line." *Id.* Officer Heinze states "at that point [he] deployed two rounds of pepper ball at Mr. Hamilton." *Id.*

Officer Michael O'Neill states that he was also one of the officers attempting to keep the protesters

on the southeast corner of Market and Franklin Streets from entering Market to block the convoys. Dkt. 44, at 3. He states that a very large man approached Officer Bakala and announced he was going to cross the street. *Id.* Officer O'Neill states that he saw Officer Bakala push Plaintiff Hamilton back. *Id.* Officer O'Neill observed Plaintiff again say that he was going to cross the street and was told "no." Dkt. 44-2, at 3. According to Officer O'Neill, Plaintiff took a step forward and was pushed back. *Id.* Officer O'Neill, stated that Plaintiff Hamilton then clenched his fist and "in a much louder voice than the other two previous times said that he was going to cross the street, it was his constitutional right." *Id.* Officer O'Neill stated that he became concerned that Plaintiff Hamilton was going to assault Officer Bakala. Dkt. 44-2, at 4. Officer O'Neill testified that he then "raised [his] pepper ball, [he] fired a single round, [he] hit him on the inner right portion of his thigh." Dkt. 44-2, at 3.

Neither Plaintiff was arrested due to the above events. Dkts. 48-11 and 48-12. The foregoing recitations show the extremely complex and inconsistent nature of the evidence in the case.

### E.    PENDING MOTIONS

The Defendants now move summary dismissal of all Plaintiffs' claims against them. Dkt. 31. Defendants argue that the 42 U.S.C. § 1983 claims against the individual Defendants should be dismissed because the pepper spraying incidents did not constitute Fourth Amendment seizures and did not constitute excessive force, the use of the riot baton and pepper ball against Plaintiff Hamilton was not excessive in the circumstances, and the officers are, in any event, entitled to qualified immunity. *Id.* Defendants further point out that Plaintiff Mosqueda was given an opportunity by the Court to conduct discovery and name the officer who pepper sprayed him, but did not, choosing to continue with his original complaint against "John Doe." *Id.* They argue that Plaintiff Mosqueda's entire complaint should be dismissed. *Id.*

Defendants move for summary dismissal of Plaintiffs' 42 U.S.C. § 1983 claims against the City of Olympia arguing that Plaintiffs can make no showing that the police officers here were acting pursuant to a municipal custom or policy. Dkt. 31. Defendants argue that Plaintiffs' First Amendment and substantive due process claims should be dismissed because they "are subsumed within their Fourth Amendment excessive force claims." *Id.* Defendants also urge that because the force used was not excessive, Plaintiffs' battery and negligence claims should be dismissed. *Id.*

Plaintiffs respond, arguing that, 1) Plaintiff Hamilton's pepper spray incident was a Fourth

Amendment seizure, 2) Defendant John Doe's pepper spraying of Plaintiff Mosqueda was not objectively reasonable, 3) the clubbing and pepper ball shooting of Plaintiff Hamilton was not objectively reasonable, and 4) the individual Defendants are not entitled to qualified immunity. Dkt. 48. Plaintiffs argue that their claims against the City of Olympia should not be dismissed because the City had a policy that violated the Fourth Amendment and First Amendments. Dkt. 48. Plaintiffs argue that their battery claims against the individual Defendants should not be dismissed because their excessive force claims should not be dismissed. *Id.* Plaintiffs argue that their negligence claims should not be dismissed because under the public duty doctrine, the Defendants had a duty either permit Plaintiff Hamilton to cross the street using the crosswalk or to inform Plaintiff Hamilton reasonable notice that he would no longer be permitted to cross the street. *Id.,* at 18. Plaintiff Hamilton argues that his injuries are a result of the Defendants breach of that duty. *Id.* Plaintiff Hamilton also asserts that under the public duty doctrine, once Defendants told him to go to the "safe area," they owed him a duty not to harm him when he complied. *Id.* He asserts, then, when the officers sprayed him, they were negligent. *Id.*

Defendants reply, arguing that: 1) Plaintiff Hamilton's spraying was a result of second hand spray, and so was not a Fourth Amendment seizure, 2) Plaintiff Mosqueda's claims should be dismissed because he has made no attempt to identify the officer who sprayed him, 3) the use of force against Plaintiff Hamilton was reasonable, 4) the officers are entitled to qualified immunity and 5) the claims against the City should be dismissed.

**F.     DVD SUBMITTED**

Several DVDs were submitted as part of the record. Although generally informative, they were of such a confusing nature that they were not very helpful in evaluating the witnesses' testimony.

## II.     DISCUSSION

**A.     SUMMARY JUDGMENT STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (*citing Anderson, supra*). Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife* Federation, 497 U.S. 871, 888-89 (1990).

## B.    QUALIFIED IMMUNITY FOR FOURTH AMENDMENT CLAIMS

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

"A private right of action exists against police officers who, acting under the color of state law, violate federal constitutional or statutory rights." *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001) *citing* 42 U.S.C. § 1983. "The Supreme Court has established a two-part analysis for determining whether qualified immunity is appropriate is a suit against an officer for an alleged violation of

a constitutional right." *Boyd v. Benton County*, 374 F.3d 773, 778, (9th Cir. 2004), *citing Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court required to rule upon qualified immunity must examine: (1) whether the officers violated the plaintiff's constitutional rights on the facts alleged and (2) if there was a violation, whether the constitution rights were clearly established. *Id.* (*internal citations omitted*). As to the first inquiry, where "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier* at 201. As to the second inquiry, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202.

### 1. *First Saucier Inquiry: Violation of Constitutional Right*

Pursuant to the Fourth Amendment of the U.S. Constitution, the Plaintiffs have the right "to be secure . . . against unreasonable searches and seizures." "[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . ., nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement . . ., but only when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989). The *Brower* Court considered the question of whether Plaintiffs were entitled to maintain a § 1983 action in which they asserted that a decedent's Fourth Amendment rights to be free from an unreasonable seizure was violated when he crashed into a police roadblock and was killed. *Id.* The *Brower* Court held that due to the circumstances in that case, where officers placed an 18-wheel truck completely across the highway on a curve in the decedent's path and aimed headlights so as to blind him on his approach, decedent was "seized" under the Fourth Amendment. *Id.* Defendants here argue, in essence, that a party must be subject to an arrest in order to be "seized" for purposes of the Fourth Amendment. This is too restrictive a view of the Fourth Amendment's prohibition of unreasonable seizures, as the *Brower* Court's holding implicitly shows. The Court there found that a deceased individual, who had not been arrested, could be nevertheless be "seized" under the Fourth Amendment. *Id.*

"Under the Fourth Amendment, officers may only use such force as is objectively reasonable under the circumstances." *Boyd* at 778. "Determining whether a particular use of force is reasonable requires the fact-finder to balance the nature and quality of the intrusion on the individual's Fourth Amendment

interests against the countervailing government interests at stake." *Id.,* at 778-779. Accordingly, "[t]his balance must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The need for such balancing means that summary judgment in excessive force cases should be granted sparingly." *Id.* Consideration of "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Jackson* at 651.

*Graham v. Connor*, 490 U.S. 386, 396 (1989), lists factors relevant to the merits of an excessive force claim: "requiring careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

     a.    <u>November 10, 2007, Pepper Spray Incident Involving Plaintiff Hamilton Near the Port's Main Gate</u>

The threshold issue to be decided is whether Plaintiff Hamilton was "seized" for purposes of the Fourth Amendment when he was pepper sprayed twice on November 10, 2007. Review of the record indicates that there are issues of fact as to whether he was seized. First, there are issues of fact as to whether there was a "governmental termination of freedom of movement." The facts viewed in a light most favorable to Plaintiff Hamilton indicate that his freedom of movement was terminated in both instances after he was sprayed with pepper spray. Secondly, there are issues of fact as to whether the "means" here, the application of pepper spray was "intentionally applied." *Brower* at 596-97. Plaintiff Hamilton testified that the officer deliberately pointed the pepper spray canister at him and sprayed him. Dkt. 48-5, at 4.

The next question to be decided is wether the "seizure" was reasonable. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Considering the first *Graham* factor, the severity of the crime at issue here weighs against holding that spraying Plaintiff Hamilton was reasonable as a matter of law. The facts indicate that Plaintiff had probably violated no law. The next *Graham* factor to consider in determining whether an officer's use of force was reasonable is examining whether the individual posed an "immediate threat to the safety" of the officer or others. Viewing the facts in a light most favorable to Plaintiff Hamilton, he did not pose an immediate threat to the safety of the officers or others. As to the last *Graham* factor, there is no

1  evidence that Plaintiff Hamilton was actively evading arrest.  Because the Court must "take the facts in the

2  light most favorable to the party asserting the injury," *Saucier* at 201, Defendants are  unable, for the

3  purposes of this motion, to establish that the use of force was reasonable.

            b.    <u>November 10, 2007, Pepper Spray Incident Involving Plaintiff Mosqueda at</u>

4  <u>Fourth and Plum Streets</u>

5    On June 6, 2008, Plaintiff filed the Complaint in this matter, alleging that while participating in a

6  political demonstration, Defendant John Doe police officer sprayed him with pepper spray.  Dkt. 1,

7  *Mosqueda v. City of Olympia, et al.,* Western District of Washington cause number 08-5366RJB.   In

8  January of 2009, Plaintiff Mosqueda sought to amend his Complaint to name all the City of Olympia police

9  officers on duty on November 10, 2007.  Dkt. 16.  His motion was denied because Defendants had

10  propounded discovery responses which named seven officers with information about the event.  Dkt. 18.

11  The deadline for naming additional parties was extended in order to give Plaintiff Mosqueda time to

12  conduct discovery and move again to amend his complaint to add additional parties.  *Id.*  Plaintiff Hamilton

13  did not move to amend his Complaint.

14      Defendants urge that Plaintiff's complaint against them should be dismissed for failing to identify an

15  individual defendant.  Plaintiff Mosqueda does not address this issue in his Response.

16      Plaintiff Mosqueda's Complaint against individual officer "John Doe" should be dismissed.

17  Plaintiff Mosqueda has been given several opportunities to identify which individual officer (or group of

18  officers) are responsible for his pepper spraying incident and has failed so to do.  Although Plaintiff

19  Mosqueda has stated that he is unsure which officer sprayed him due to their all being in riot gear, the

20  record shows that he has not succeeded in narrowing the field.  Plaintiff has failed to carry his burden to

21  show an individually named officer (or even a group of officers) is liable under § 1983.   Plaintiff

22  Mosqueda's Complaint against "John Doe" should be dismissed.

23             c.    <u>November 11, 2007, Baton and Pepper Ball Incident Involving Plaintiff</u>

24  <u>Hamilton</u>

25      Defendants do not meaningfully argue that Plaintiff Hamilton was not seized when several officers

26  used their batons on him and shot him with pepper balls as he tried to cross the street.

27      Turning to the question of whether the seizure was reasonable under *Graham*, the severity of the

28  crime involving Plaintiff Hamilton weighs against finding that the use of the baton and pepper balls were

reasonable. Plaintiff Hamilton was not arrested nor charged with a crime in connection with his announcement that he intended to cross the street and attempt to do so. Viewing the facts in a light favorable to Hamilton, there is little evidence that Hamilton posed "an immediate threat to the safety of the officers or others." Hamilton's version of events indicates that he was not "actively resisting arrest or attempting to evade arrest by flight." There are issues of fact as to whether the officer's use of the baton and pepper balls against Hamilton was reasonable.

### 2. *Second Saucier Inquiry: Clearly Established Constitutional Right*

The next step under *Saucier* in determining if the individual officers are protected by qualified immunity, is to ascertain if Plaintiffs' constitutional rights were clearly established at the time of the injury. *Saucier* at 201. In excessive force cases, the inquiry is whether "under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and whether any mistake to the contrary would have been unreasonable." *Boyd* at 781; *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003).

#### a. Pepper Spray Incident Involving Plaintiff Hamilton

Defendants have not made a sufficient showing that Plaintiff Hamilton's constitutional reights were not clearly established at the time. Under the circumstances alleged, a reasonable officer would have had fair notice that pepper spraying an individual not suspected of violating a crime was a violation of that person's constitutional rights. There are issues of fact as to what occurred, and if Plaintiff Hamilton's version of events is believed, he was intentionally sprayed with pepper spray while attempting to help another protestor, who had been blinded by pepper spray, escape the melee. Under those circumstances, the officers could not reasonably have believed their safety or that of others was endangered, and would have fair notice that spraying Plaintiff was unlawful. At this stage in the litigation, the Defendants' motion to be found immune from suit based on qualified immunity should be denied without prejudice.

#### b. Pepper Spray Incident Involving Plaintiff Mosqueda

"The second part of the Saucier analysis asks whether the plaintiff's constitutional right was clearly established at the time of the injury." *Boyd* at 780. Because Plaintiff Mosqueda failed to name an individual officer who violated his constitutional rights, further inquiry is not necessary. *See Saucier* at 201.

c.    Baton and Pepper Ball Incident Involving Plaintiff Hamilton

The Defendants' motion for qualified immunity as to the baton and pepper ball incident should also be denied without prejudice. As above, viewing the facts in a light most favorable to Plaintiff Hamilton, reasonable officers in the Defendants position would have known that using batons and pepper balls on an individual calmly attempting to use a cross walk to cross a city street would be a violation of his constitutional rights.

## C.    QUALIFIED IMMUNITY FOR FIRST AMENDMENT CLAIMS

Plaintiff Hamilton was expressing his anti-war message on a public street, a traditional public forum. *Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 787 (9th Cir. 2008). "It has been clearly established since time immemorial that city streets and sidewalks are public fora" and demonstrations on them are entitled to First Amendment protection. *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir.1996). In order to demonstrate a First Amendment violation, a plaintiff must show that a defendant acted in a manner which "deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor" in the defendant's conduct. *Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1300 (9th Cir. 1999).

In their Motion for Summary Judgment, Defendants state "Plaintiffs' First Amendment and substantive due process claims are subsumed within their Fourth Amendment excessive force claims." Dkt. 31, at 24. Defendants do not cite any authority for this contention, nor do they reference any facts from the record.

Plaintiff Mosqueda's Complaint against officer "John Doe" should be dismissed without prejudice, as explained above.

Plaintiff Hamilton argues that the Defendants' actions here, using pepper spray on him and using a baton and pepper balls, operated to chill his speech. Dkt. 48, at 15. He references a change in the City's policy regarding the November 2007, protests as evidence of intent. *Id.* Defendants do not address the issue of intent, but do state repeatedly that they were attempting to maintain order. As the above factual recitation demonstrates, there are issues of fact as to what was happening in each instance of police contact with Hamilton. Further, Defendants make no showing that they are entitled to qualified immunity as to the First Amendment claims. The Court cannot find that Defendants have shown that they are entitled to

summary dismissal of Plaintiff Hamilton's First Amendment claims. Their motion as to this claim should be denied.

### D.    QUALIFIED IMMUNITY FOR FOURTEENTH AMENDMENT CLAIMS

"If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272, n. 7 (1997).

Here, it appears that Plaintiff Hamilton's claims are covered by the Fourth and First Amendments. His claims under the Fourteenth Amendment should be dismissed.

### E.    MUNICIPAL LIABILITY UNDER FEDERAL LAW

To set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must show that the defendant's employees or agents acted through an official custom, pattern or policy that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the entity ratified the unlawful conduct. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991). "In other words, there must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, (9th Cir. 2008)(*internal citations omitted*). The municipal action must be the moving force behind the injury of which plaintiff complains. *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).

#### 1.    *Fourth Amendment*

Plaintiffs argue that "[t]he use of pepper spray on an [sic] individuals who are 'nonviolent and unarmed,' not 'physically menacing,' 'did not behave threateningly toward police,' and did not 'attempt[] to inflict pain or serious injury on the arresting officers,' but only failed to comply with officers' requests that the individuals disperse, is an example of excessive force." Dkt. 48, at 11 (*citing Headwaters Forest Defense v. County of Humboldt,* 240 F.3d 1185, 1203, (9th Cir. 2000) (*vacated and remanded on other grounds, County of Humboldt v. Headwaters Forest Defense,* 534 U.S. 801 (2001)). Plaintiffs argue that the City had a policy that encouraged or permitted officers to use pepper spray on individuals to effect compliance with officer requests in violation of the Fourth Amendment. *Id.* Plaintiffs point to the lead officer, Officer Holmes', testimony that he determined that due to "the protestors hostile and aggressive

speech directed against the police and a complete unwillingness to obey [his] multiple direct orders to leave," the best way to avoid injuries was to make a "general application of pepper spray" at both the Port's Main and North gates. Dkt. 38, at 2. Plaintiffs argue that by "virtue of his title and role in the action," he "could fairly be said to represent official policy." Dkt. 48, at 12. Plaintiffs argue that Defendant Maynard, the officer who is an instructor in pepper ball and chemical agents' "views on the appropriate use of pepper ball delivery systems . . . could fairly be said to represent official policy." *Id.* According to Officer Maynard,

> Pepper spray's advantages include the ability to affect one or more persons at a greater distance, reducing the need for the officer to engage persons physically in a "hands on" manner. This limits the chance of injury to both. Pepper spray may be used to disperse people from an area or to restrict them from entering an area. It may be used to assist in subduing a suspect who is combative or non-compliant. It may be used to expose a hidden subject, to break up a fight, or to subdue unruly persons or crowds. . . . The major disadvantage of pepper spray is the unintended secondary application to persons or even other officers, often because of wind.

Dkt. 41, at 2-3.

Plaintiffs have shown that there are sufficient issue of fact to show that the decision to use pepper spray/pepper balls was "an official custom, pattern, or policy" under *Monell.* The City's Motion for Summary Judgment as to this claim should be denied.

### 2. *First Amendment*

As to their First Amendment claim against the City, Plaintiffs point to the Olympia City Council Resolution M-1476, passed in December of 2000 ("M-1476"), as an "official policy that permits deliberate indifference to, or violates the plaintiffs' civil rights." *Monell,* at 647. Through M-1476, the Olympia City Council "acknowledges and accepts its responsibility to preserve and balance essential civil rights for all citizens, including the right to peaceably assemble, the right to freedom of speech and the right to freedom of movement on public ways." Dkt. 42-2, at 2. M-1476 provides that the City's response to both planned and spontaneous public events of expression of opinion will be guided by the following:

> - Whether or not conditions are present that either involve or threaten to involve injury to any person or animal, or damage to any public or private property;
> - The degree to which an event respects the civil and constitutional rights of all citizens and reflects the spirit of cooperation and compromise when the rights of event participants conflict with the rights of non-participants;
> - The ability of emergency services (fire, police medical) to reach participants and non-participants in a timely manner that is consistent with normal response time to the event locale;
> - The extent to which appropriate support and safety services are available.

Dkt. 42-2, at 4.  Plaintiffs further point to the mission of the Olympia Police Department as stated by Chief

of Police, Gary Michel, as another "official policy that permits deliberate indifference to, or violates the

plaintiffs' civil rights." *Monell*, at 647.  The mission of the police during the November 2007, Port of

Olympia protests was in this order:

> - Protect citizens and officers from injury;
> - Provide for the safe passage of military equipment out of the Port and to I-5 for
>   movement to Fort Lewis;
> - Apprehend law violators if staff and jail space are available;
> - Balance the interest of protestors and the public consistent with . . . M-1476.

Dkt. 42, at 2.

As stated above, Plaintiffs were expressing their anti-war message on a public street, a traditional

public forum.  *Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept.*, 533 F.3d 780,

787 (9th Cir. 2008).  "Generally, content-based speech restrictions in public fora are subject to strict

scrutiny."  *Id.*  The government may, however, impose reasonable "time, place, or manner" regulations on

speech in public fora, provided the regulations are justified without reference to the content of the

regulated speech, are narrowly tailored to serve a significant governmental interest, and leave open ample

alternative channels for communication of the information."  *Id.*  "[W]hether a statute is content neutral or

content based is something that can be determined on the face of it; if the statute describes speech by

content then it is content based."  *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005)(*internal

citations omitted*).

The first question is whether the application of M-1476 and the mission statement of the police

department to the Plaintiffs' protest activities would qualify as a content-neutral time, place, or manner

regulation.  The plain language of M-1476 is content neutral.  Plaintiffs advance the argument, though,

that during the time of the protests, the City, through the police department mission statement "modified its

general approach toward 'events that involve . . . public expression of opinion' to subordinate 'the interest

of the protesters and the public' as guided by [M-1476] to the interests of the military in moving equipment

from the Port to Fort Lewis."  Dkt. 48, at 15.  Plaintiffs argue that by subordinating the anti-war protesters

interests to the military interests, "one can infer from the circumstances that but for the anti-war message"

the Chief of Police would not have given "higher weight to a certain subset of public roadway users - here

the military -than normal."  *Id.*  In the Ninth Circuit, a law "is content-based if either the main purpose in

enacting it was to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face." *Center for Bio-Ethical Reform*, at 788. "A statute that restricts speech only when it is disruptive because of its manner, not its content, is an example of content-neutral regulation that has been affirmed time and again." *Id.,* at 790.

The City does not address whether the M-1476 or the police department's mission statement for the November 2007, protests is content based or content neutral. Even if they are content neutral, the City does not address whether they are "narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information." *Center for Bio-Ethical Reform*, at 788. The City is not entitled to summary judgment as a result.

### 3. *Fourteenth Amendment*

In light of the fact that the Plaintiffs' claims should be addressed under other specific provisions of the constitution, their substantive due process claims against the City should be dismissed. *Lanier*, at 272, n. 7.

## D. STATE CLAIMS

Plaintiff Mosqueda's claims for battery and negligence against officer "John Doe" should be dismissed without prejudice, as explained above.

### 1. *Battery*

Under Washington law, a "battery is a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent." *McKinney v. Tukwila,* 103 Wn. App. 391, 408 (2000).

There are issues of fact as to Plaintiff Hamilton's excessive force claims, which form the factual basis for his negligence claim. Defendants argue that they are entitled to qualified immunity from the state battery claim. State qualified immunity is not "available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest." *Staats v. Brown*, 139 Wash.2d 757, 780 (2000). As a result, Defendants' Motion for Summary Judgment on Plaintiff Hamilton's battery claim should be denied.

### 2. *Negligence*

The well know elements of negligence are duty, breach, and proximately caused damage to the plaintiff. *Hertog v. City of Seattle,* 138 Wn.2d 265, 275 (1999). Plaintiff Hamilton relies on Washington's

"public duty" doctrine to establish the duty owed him. Dkt. 48.

> The threshold determination in a negligence action is whether a duty of care is owed by the defendant to the plaintiff. Whether the defendant is a governmental entity or a private person, to be actionable, the duty must be one owed to the injured plaintiff, and not one owed to the public in general. This basic principle of negligence law is expressed in the 'public duty doctrine.'

*Babcock v. Mason County Fire Dist. No. 6,* 144 Wash.2d 774, 786 (2001). "There are four exceptions to the public duty doctrine in which the governmental agency acquires a special duty of care owed to a particular plaintiff or a limited class of potential plaintiffs." *Id.* One of these exceptions, the "special relationship" exception, is at issue here.

"The special relationship exception is a 'focusing tool' used to determine whether a local government 'is under a general duty to a nebulous public or whether that duty has focused on the claimant." *Id.,* at 786.

> A special relationship arises where (1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff.

*Id.*

Plaintiff Hamilton argues that there was direct contact between himself and the City when he and the other protesters were told to go to the gravel area on November 10, 2007. Dkt. 48. He asserts that they were told that it was a "safe area." Dkt. 48. Plaintiff argues that he was justified in relying on the express assurances he received that he would not be harmed if he moved into the "safe area." *Id.*

As to the events on November 11, 2007, he likewise argues that he was specifically advised by the City, that "if [he] wanted to cross the street, [he] had to use the pedestrian crosswalks." Dkt. 48, at 17. He asserts that this contact set him apart from the general public, and contained express assurances that he would be permitted to cross the street. *Id.* He asserts that justifiably relied on those assertions. *Id.*

Defendants respond, contesting that an assurance was ever given that there was a "safe area," as to the first incident. Defendants argue that, in any event, the directions that were given were to the public at large and not just to Plaintiff Hamilton, so there was no privity. Dkt. 50. Defendants point out that to the extent people were told that they could use the cross walk, Plaintiff admits that the directions were given the day before to the group, and they were told that they "couldn't just cross randomly anywhere." Dkt. 50.

Plaintiff Hamilton has shown that there are issues of fact as to whether Defendants acted negligently when he was pepper sprayed on November 10, 2007. If Plaintiff's version of events is believed, the assurances that were given were to those involved in the protest. Considering the circumstances, Plaintiff has shown that he was justified in relying on those assurances.

Plaintiff Hamilton has not carried his burden to show that there are issues of fact as to his negligence claim for the baton and pepper ball incident. It should be dismissed with prejudice.

### III.  ORDER

Therefore, it is hereby, **ORDERED** that:

- The Defendants' Motions for Summary Judgment (Dkt. 21 in case number 08-5366RJB and Dkt. 31in case number 08-5315RJB) are **GRANTED, IN PART,  AS FOLLOWS**:

  - Plaintiff Mosqueda's claims against individual officer "John Doe" **ARE DISMISSED**;
  - Plaintiffs' Substantive Due Process claims against the individual officers and City **ARE DISMISSED**;

- The Defendants' Motions for Summary Judgment (Dkt. 21 in case number 08-5366RJB and Dkt. 31in case number 08-5315RJB) are **DENIED, IN PART,  AS TO:**

  - Plaintiff Hamilton's Fourth Amendment claim against the individual officers;
  - Plaintiff Hamilton's First Amendment claim against the individual officers;
  - Plaintiffs' Fourth Amendment claim against the City;
  - Plaintiffs' First Amendment claim against the City; and
  - Plaintiff Hamilton's state law claims of battery and negligence.

/ / /

/ /

/

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 8th day of September, 2009.

Robert J Bryan
United States District Judge